IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JERRY JELLIS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Case No. 3:15-cv-00630-NJR |
| | ) | |
| R. HARRINGTON, | ) | |
| LT. TOURVILLE, | ) | |
| R. DAVIS, | ) | |
| C/O HALE, | ) | |
| C/O LINDENBERG, | ) | |
| MS. NEPPI, | ) | |
| MS. OAKLEY, | ) | |
| MS. CARTER, | ) | |
| B. THOMAS, | ) | |
| LT. VEATH, | ) | |
| JASON HART, | ) | |
| AMY LANG, and | ) | |
| DR. SHEARING, | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Jerry Jellis is currently incarcerated at the Lawrence Correctional Center in Sumner, Illinois, but he was previously incarcerated at the Menard Correctional Center in Menard, Illinois. (Doc. 1 at 1.) Proceeding *pro se*, Jellis has filed a civil rights action pursuant to 42 U.S.C. § 1983 against several prison officials at Menard. (*Id.*) Jellis alleges that numerous officers were involved in an attack against him, that a prison investigator attempted to cover up the attack, that officers wrote a false disciplinary ticket against him concerning the events preceding the attack, that he was not afforded the process due to him related to the ticket and the punishments flowing from it, that grievance officers violated his rights when they failed to

process his grievances related to these events, and that medical staff at the prison failed to adequately treat the injuries Jellis incurred due to the attack. (*Id.* at 7-16.) Jellis seeks declaratory relief, compensatory damages, and punitive damages. (*Id.* at 17.)

This matter is now before the Court for a preliminary review of Jellis's complaint pursuant to 28 U.S.C. § 1915A. Under 28 U.S.C. § 1915A, the Court shall review a "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a government entity." During this preliminary review under § 1915A, the court "shall identify cognizable claims or dismiss the complaint, or any portion of the complaint," if the complaint "is frivolous, malicious, or fails to state a claim on which relief may be granted" or if it "seeks monetary relief from a defendant who is immune from such relief."

## Background

According to the complaint and the exhibits attached to it, on August 27, 2013, Jellis was sitting at a table in the prison cafeteria at Menard when "the gun tower in the chow hall . . . shot the gun off." (Doc. 1-2 at 2.) Jellis remained seated at his table as several officers and Warden Harrington entered the cafeteria; the Warden and the officers directed the inmates to get on the ground. (*Id.* at 2-4.) Jellis says he abided by the order, but did not do so quickly enough–Jellis saw Harrington say something to Tourville, prompting Tourville to order two guards to take Jellis to segregation for disrespecting Harrington. (Doc. 1 at 7; Doc. 1-2 at 3.) The other officers–Hale and Lindenberg–handcuffed Jellis and took him to segregation. (Doc. 1 at 8-9.) As they walked Jellis to the segregation unit, Hale and Lindenberg asked Jellis if he liked "to disrespect the Warden," and when Jellis asked how he disrespected Harrington, Hale hit Jellis on the back of the neck with his fist and told him to "shut the fuck up." (*Id.*) Both officers then told Jellis that they were going to teach Jellis "not to be disrespectful to the Warden." (*Id.*)

Jellis was taken to a holding cage near the N-2 segregation unit visiting room. (*Id.*) There, Hale allegedly put Jellis in a head lock and rammed his head into the cage. (*Id.*) Hale then stood on one side of Jellis with Lindenberg on the other and both took turns striking Jellis: Hale punched Jellis four times and kicked him in the left knee, while Lindenberg punched Jellis three times and then kicked him in the stomach. (*Id.*) The two then unlocked the first holding cage and threw Jellis face down onto the floor of the cage. (*Id.*) Lindenberg lifted up Jellis's arms and put his knee into Jellis's lower back with all of his weight, telling Jellis that he would now "think twice" about "disrespecting" Warden Harrington. (*Id.*) Lindenberg then started to take the handcuffs off of Jellis, but Hale told him to wait. (*Id.*) Hale then lifted Jellis's left arm into the air and then stomped hard onto his lower back. (*Id.*) As Hale kicked Jellis, he allegedly told Jellis not to "ever disrespect the Warden again." (*Id.*) Hale then took the handcuffs off of Jellis, slammed the cage door shut, and told Jellis he could get up. (*Id.*)

After the attack ended, Jellis was held in segregation at the prison. (*Id.* at 14-16.) During the first week of September 2013, Jellis sent several requests to Lang, a medical technician in the segregation unit, concerning his injuries. (*Id.*) During one visit with Lang, Jellis told her that the officers beat him, that he was concerned about back injuries from the attack, and that he wanted to see a doctor for possible x-rays and diagnosis. (*Id.*) Lang gave Jellis ibuprofen and acetaminophen for the pain and told him that he would need to file a request through sick call to see the doctor. (*Id.*) Lang ran out of the medication three days later and put in more call slips in mid-September. (*Id.*) Lang saw Jellis eight days later, again telling Jellis to put in a request to see a doctor and pay a co-pay. (*Id.*) Jellis agreed to do so and put in another request, but Jellis was not slated to see Dr. Shearing until September 20. (*Id.*) Jellis was still not seen on September 20, and then was moved to Stateville Correctional Center for a court writ from late

September to mid-October.  (*Id.*)  When he returned to Menard on October 9, 2013, Jellis sent more requests to Lang and Shearing asking to be seen, but was allegedly ignored.  (*See id.*)

Several other events happened after the attack.  For one, Jellis wrote a letter about the attack to Larry Beck at the Illinois Department of Corrections.  (*Id.* at 10-11.)  That led Brad Thomas, an "investigator" with "internal affairs" at Menard, to become involved.  (*Id.*)  Jellis says that Thomas had no interest in uncovering the truth about the attack, but instead desired to "cover the beating up."  (*Id.*)  Thomas allegedly told Jellis that he was a liar, that officers at Menard do not beat inmates, and that Jellis needed to stop lying or Thomas would make sure he stayed in segregation for a long time.  (*Id.*)  Thomas asked Jellis about his witnesses and Jellis conceded he had none, but Jellis asked for a lie detector–a request that Thomas rebuffed.  (*Id.*)  Thomas also called Harrington, and Harrington admitted that he had Jellis "walked" to segregation for "disrespecting him."  (*Id.*)  Thomas relayed that discussion to Jellis, telling Jellis that he was "lucky"–that if Thomas was in the tower that day, he would have shot Jellis.  (*Id.*)  Jellis also claims that Thomas added material to the final report after Jellis signed it.  (*Id.*)

In addition, following the attack, Jellis was written up on a disciplinary ticket by Officer Davis for refusing the officers' order to sit on the ground in the cafeteria on August 27, 2013.  (*Id.* at 11-12.)  The ticket led to discipline imposed by Harrington, Veath, and Hart; Jellis was punished with three months of segregation, three months in "C grade," three months of yard restriction, and three months in commissary denial.  (*Id.*)  Jellis says the ticket was false–Davis was not present that day–and that the punishment was imposed without a fair hearing and without a final report.  (*Id.*)  Jellis also claims that the hearing was unfair because Veath could not be impartial, as Jellis had a pending lawsuit against Veath in federal court.  (*Id.*)

Throughout October 2013, Jellis wrote grievances concerning the attack to several officials at Menard, but those were allegedly ignored. (*Id.* at 12-13.) Sometime on or before October 2014, Jellis was transferred from Menard to Lawrence, where he says he was able to get medical attention for his injuries. (*Id.* at 16.) He filed additional grievances with the Illinois Department of Corrections after his transfer. (*Id.* at 6.) Unsatisfied with the Department's response to all of his grievances, Jellis filed a complaint in this Court on June 8, 2015. (*Id.* at 1.)

## Discussion

Jellis divides his complaint into nine claims linked to the attack, but some of the labels for those counts could be read to narrowly construe his claims. Because the Court has a duty to interpret a *pro se* complaint broadly, the Court finds it appropriate to re-divide the claims in Jellis's *pro se* complaint into the following counts, as shown below. The parties and the Court will use these designations in all pleadings and orders, unless otherwise directed by the Court. The designation of these counts does not constitute an opinion as to their merit.

**COUNT 1:** Harrington ordered the attack on Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights.

**COUNT 2:** Tourville carried out Harrington's orders to attack Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights.

**COUNT 3:** Hale and Lindenberg used excessive force against Jellis, in violation of Jellis's Eighth Amendment rights.

**COUNT 4:** Thomas conspired to cover up the attack on Jellis or performed a negligent investigation of the attack, in violation of Jellis's constitutional rights.

**COUNT 5:** Davis wrote a false disciplinary ticket against Jellis concerning Jellis's conduct in the prison cafeteria, in violation of Jellis's due process rights.

**COUNT 6:** Harrington, Veath, and Hart imposed punishment on Jellis without providing him a fair hearing, in violation of Jellis's due process rights.

**COUNT 7:** Neppi, Oakley, Carter, and Thomas conspired together to fail to process Jellis's grievances about the attack, in violation of Jellis's rights.

**COUNT 8:** Lang delayed giving Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights.

**COUNT 9:** Dr. Shearing failed to give Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights.

Jellis's entire complaint focuses on the attack by Hale and Lindenberg, so the Court will start there (**Count 3**). To put forth an excessive force claim, a prisoner must show that an assault occurred and that it was "carried out maliciously and sadistically, rather than as part of a good-faith effort to maintain or restore discipline." *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010). To be sure, not "every malevolent touch by a prison guard gives rise to a federal cause of action"– an inmate who complains of a "'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Here, Jellis alleges that Hale and Lindenberg attacked him for an extended period, and that is sufficient to state an excessive force claim against the two for purposes of preliminary review. Accordingly, **Count 3** may proceed as to Hale and Lindenberg.

Jellis also says that Harrington (**Count 1**) and Tourville (**Count 2**) are implicated in the excessive force claim–he alleges that they either conspired with Hale and Lindenberg to facilitate the attack or were personally involved in the attack. Construing Jellis's allegations broadly, he states arguable claims under both theories for purposes of preliminary review. To yoke a defendant into an underlying constitutional violation via a conspiracy claim, a plaintiff must allege that there was "an express or implied agreement among defendants" to deprive an inmate of his constitutional rights, and an "actual deprivation of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Here,

Jellis alleges that Harrington ordered Tourville to have officers take Jellis to segregation knowing full well that the officers would attack him, and that Tourville carried out the order knowing the officers would attack him. This is sufficient to put forth arguable conspiracy claims against Harrington and Tourville for purposes of preliminary review. Alternatively, Jellis suggests that Harrington and Tourville, as supervisors of Hale and Lindenberg, were personally involved in the excessive force claim. While serving as a supervisor alone does not warrant liability under § 1983, a supervisor can be held liable for the conduct of his subordinates when he "know[s] about the conduct and facilitiate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). Construed liberally, Jellis alleges that Harrington and Tourville knew that the attack would occur and at the least approved or condoned it, meaning that they were personally involved for purposes of screening review. Under either theory, **Count 1** against Harrington and **Count 2** against Tourville may proceed.

While Jellis's claims against Harrington and Tourville may proceed, his claim against Thomas for "conspiring" to cover up the attack or for performing a negligent investigation must be dismissed (**Count 4**). To make out a conspiracy claim, a plaintiff cannot merely cry "conspiracy"–he must allege facts inferring that the defendants "reached an understanding to deprive the plaintiff of his constitutional rights." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Here, Jellis does not allege any implicit or explicit agreement between Thomas and others at the prison concerning the initial attack. In addition, the conduct he ascribes to Thomas– namely the failure to properly handle a grievance or investigation–is not the type of conduct that independently violates the United States Constitution. *See, e.g., George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (prisoner had

no claim for "failure to investigate" a claim because there was no "protected liberty interest" in having the grievance "resolved to his satisfaction"). This is true even when a defendant fails to investigate because he is trying to cover up the acts of another. A "cover up" does not constitute a violation of federal law unless it is tied to a separate constitutional injury. *See Vasquez v. Hernandez*, 60 F.3d 325, 329 (7th Cir. 1995) (affirming dismissal of "cover up" claim where prisoner did not allege an injury to his rights due to the cover up); *Kies v. City of Aurora*, 149 F. Supp. 2d 421, 424 (N.D. Ill. 2001) ("[C]oncealment of constitutional violations, such as false arrest, excessive force, and malicious prosecution, are insufficient to raise a separate constitutional violation unless the victim is deprived his or her right to access to the courts."). While a prisoner might have a "cover up" claim if an official's conduct impeded his ability to seek "legal redress," *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000), nothing like that is alleged here, so all of **Count 4** must be dismissed without prejudice.

Jellis next claims that his due process rights were violated when Davis issued him a false disciplinary report based on the events in the cafeteria (**Count 5**) and when he was punished without a fair hearing or an impartial decision-maker by Harrington, Veath, and Hart related to that report (**Count 6**). Both of these due process claims rise and fall based on whether Jellis's ultimate punishments were severe enough to trigger a liberty interest: if they did, Jellis must receive "advance written notice of the charges, an opportunity to present testimony and documentary evidence to an impartial decision-maker, and a written explanation for the discipline that is supported by some evidence in the record"; if they did not, no process is due. *Piggle v. Cotton*, 344 F.3d 674, 677 (7th Cir. 2003). The most severe punishment meted out here–three months in segregation–*might* trigger due process protections, so Jellis's claim cannot be dismissed at the gate for want of any process due. *See Toston v. Thurmer*, 689 F.3d 828, 832

(7th Cir. 2012) (reversing dismissal of segregation claim and ruling that ninety day placement in segregation could trigger due process safeguards if the "conditions in segregation [were] unusually harsh"). And Jellis's claim that the ticket was "false" suggests that the punishment was not supported by evidence, implicating a due process concern. *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994). Likewise, his claim that one of the decision-makers was impartial and that he was not given a final report also implicates due process concerns. *Piggle*, 344 F.3d at 677. Accordingly, **Count 5** and **Count 6** may proceed past preliminary review.

Jellis next alleges that grievance officers at the prison violated his constitutional rights when they failed to process his grievances (**Count 7**). To the extent Jellis is trying to raise a due process claim related to his grievances, that claim is a non-starter: the Seventh Circuit has rejected any free-standing claim concerning a grievance. *See*, *e.g.*, *Courtney v. Devore*, 595 F. App'x 618, 620-21 (7th Cir. 2014) (noting that "state grievance procedures do not create substantive liberty interests protected by due process," and the "mishandling" of those grievances states no claim); *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("Prison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the Due Process Clause . . . ."). To be sure, a prisoner could make out a retaliation-based claim linked to grievance activity, but only if he "plausibly allege[s]" that the grievance filings were "at least a motivating factor in the defendants' decision to retaliate," among other requirements. *Santana v. Cook Cnty. Bd. of Review*, 679 F.3d 614, 622 (7th Cir. 2012). Here, Jellis does not allege that the defendants' failure to process his grievances was linked to the content of his grievances or any other protected activity. In the end, Jellis's grievance-related claim consists of a flat assertion that his grievances were mishandled by various Menard officials, but the "alleged mishandling of [a prisoner's] grievance by persons

who otherwise did not cause or participate in the underlying conduct states no claim." *Owens*, 635 F.3d at 953. So **Count 7** must be dismissed without prejudice.

Finally, Jellis brings claims against two medical officials at Menard: he says that Lang delayed referring him to a doctor in the weeks following the attack, that Dr. Shearing failed to see him in the weeks after the attack, and that Lang and Shearing ignored his requests to be seen after he returned from Stateville in the months following the attack (**Counts 8 and 9**). To state a medical claim under the Eighth Amendment, a plaintiff must first show that his condition "was objectively serious," and he must then demonstrate that officials acted with the requisite intent towards that condition. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). For screening purposes, Jellis's claim passes the objective hurdle–he says that he suffered severe back pain from the attack, and this is the kind of condition that a lay person would "recognize" as needing "a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). His claim also passes the subjective hurdle–allegations of a failure to treat or a "delay in treating non-life threatening but painful conditions may constitute deliberate indifference." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). Accordingly, **Counts 8 and 9** may proceed.

## Disposition

IT IS HEREBY ORDERED that, for the reasons stated, **COUNT 1** shall **PROCEED** against **HARRINGTON**, **COUNT 2** shall **PROCEED** against **TOURVILLE**, and **COUNT 3** shall **PROCEED** against **HALE** and **LINDENBERG**.

IT IS FURTHER ORDERED that **COUNT 4** is **DISMISSED without prejudice**.

IT IS FURTHER ORDERED that **COUNT 5** shall **PROCEED** against **DAVIS** and **COUNT 6** shall **PROCEED** against **HARRINGTON**, **VEATH**, and **HART**.

IT IS FURTHER ORDERED that COUNT 7 is DISMISSED without prejudice. Because there are no further claims against them, NEPPI, OAKLEY, CARTER, and THOMAS are DISMISSED from this case.

IT IS FURTHER ORDERED that COUNT 8 shall PROCEED against LANG and COUNT 9 shall PROCEED against SHEARING.

IT IS FURTHER ORDERED that Plaintiff's Motion for Service of Process at Government Expense (Doc. 3) is GRANTED. Service shall be ordered as indicated below.

IT IS FURTHER ORDERED that the Clerk of Court shall prepare for Defendants HARRINGTON, TOURVILLE, DAVIS, HALE, LINDENBERG, VEATH, HART, LANG, and SHEARING: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is DIRECTED to mail these forms, a copy of the complaint, and this Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that, with respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

**IT IS FURTHER ORDERED** that Plaintiff shall serve upon Defendants (or upon defense counsel once an appearance is entered) a copy of every pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of the document was served on Defendants or counsel. Any paper received by a judge that has not been filed with the Clerk or that fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge Donald G. Wilkerson for further pre-trial proceedings.

**IT IS FURTHER ORDERED** that Plaintiff's pending Motion for Recruitment of Counsel (Doc. 6) is **REFERRED** to Magistrate Judge Donald G. Wilkerson for consideration.

Further, this entire matter is **REFERRED** to Magistrate Judge Donald G. Wilkerson for disposition, as contemplated by Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *should all the parties consent to such a referral.*

**IT IS FURTHER ORDERED** that if judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under § 1915 for leave to commence this action without being required to prepay fees and costs, the applicant and his or her attorney were deemed to have entered into a stipulation that the recovery, if any, secured in

the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against plaintiff and remit the balance to plaintiff.  Local Rule 3.1(c)(1)

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts.  This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs.  Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution.  See FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:  July 7, 2015**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**