## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JERRY JELLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:15-cv-630-NJR-DGW** |
| | ) | |
| **RICHARD HARRINGTON, JOHN** | ) | |
| **TOURVILLE, RYAN DAVIS, LARRY** | ) | |
| **HALE, DONALD LINDENBERG,** | ) | |
| **TIMOTHY VEATH, JASON HART,** | ) | |
| **AIMEE LANG, and ROBERT** | ) | |
| **SHEARING,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Jerry Jellis, an inmate of the Illinois Department of Corrections ("IDOC") currently incarcerated at Lawrence Correctional Center, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging claims related to an incident at Menard Correctional Center that occurred on August 27, 2013. On that date, Jellis claims he was given a false disciplinary ticket and attacked by correctional officers while being escorted to segregation. He was then denied adequate medical care, subjected to an inadequate investigation of his claims, subjected to an unfair hearing on the false ticket, and his grievances were ignored.

Several motions are now pending before the Court: the motion for summary judgment filed by Defendant Shearing (Doc. 137), the motion for summary judgment filed by Defendants Davis, Hale, Harrington, Hart, Lang, Lindenberg, Tourville, and

Veath ("IDOC Defendants") (Doc. 140), the motion to deny Defendant Shearing's motion filed by Plaintiff Jerry Jellis (Doc. 154), the motion to strike Plaintiff Jellis's motion filed by Defendant Shearing (Doc. 155), and the motion to strike Plaintiff Jellis's response filed by the IDOC Defendants (Doc. 157).

## INTRODUCTION

On July 8, 2015, Jellis's complaint was screened pursuant to 28 U.S.C. § 1915A, and he was permitted to proceed on the following claims:

**Count 1:** Harrington ordered the attack on Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights.

**Count 2:** Tourville carried out Harrington's orders to attack Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights.

**Count 3:** Hale and Lindenberg used excessive force against Jellis, in violation of Jellis's Eighth Amendment rights.

**Count 5:** Davis wrote a false disciplinary ticket against Jellis concerning Jellis's conduct in the prison cafeteria, in violation of Jellis's due process rights.

**Count 6:** Harrington, Veath, and Hart imposed punishment on Jellis without providing him a fair hearing, in violation of Jellis's due process rights.

**Count 8:** Lang delayed giving Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights.

**Count 9:** Dr. Shearing failed to give Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights.

(Doc. 7).[1]

On February 17, 2017, Defendants filed their respective motions for summary judgment (Docs. 137, 140). On March 31, 2017, after filing his response to Dr. Shearing's summary judgment motion, Jellis filed a "supplemental Motion to Defendant Shearing's Motion for Summary Judgment" (Doc. 154) without Court approval. The supplement is a sur-reply brief that under no circumstances will be accepted. *See* Local Rule 7.1(c). Thus, Dr. Shearing's motion to strike this document (Doc. 155) is granted, and the supplement (Doc. 154) is stricken.

The IDOC Defendants seek to strike Jellis's response to their motion for summary judgment, arguing that it was filed too late. In the alternative, the IDOC Defendants ask the Court to consider their reply in support of summary judgment. The IDOC Defendants' motion for summary judgment was filed on February 17, 2017, and Jellis's response was due on March 23, 2017, thirty three days later. *See* Local Rule 7.1(c)(1). Jellis did not file his response until April 6, 2017—fourteen days late. Jellis explains that he mailed his response on March 14, 2017, but that he did not receive confirmation from the Clerk of Court (Doc. 158). He then resubmitted the response on April 2, 2017 (*Id.*). In the interests of justice, the Court will consider Jellis's response and deem it timely filed. Thus, the IDOC Defendants' motion to strike (Doc. 157) is denied. The Court instead considers the IDOC Defendants' reply in support of summary judgment. Jellis's motion for clarification (Doc. 158) is denied as moot.

---

[1] Counts 4 and 7 were dismissed without prejudice.

Those issues having been resolved, the Court now considers Defendants' motions for summary judgment (Docs. 137 and 140), Jellis's responses (Docs. 150 and 156), and Defendants' replies (Docs. 151 and 157).

## BACKGROUND

Around 9:30 a.m. on August 27, 2013, Jellis was sitting on a bench at a table in the general population yard at Menard when a shot was fired in the dining room (called Randolph Hall) (Doc. 141-1, pp. 9, 11). Jellis, along with another inmate at the table, remained seated, and a few minutes later Warden Harrington came through the yard yelling, "get down, get down, get down" (*Id*. at 12-13). Jellis believed Warden Harrington was talking to another person, as he was already sitting, and did nothing (*Id*. at 13). Warden Harrington then said, "you, at the fucking table," prompting Jellis to get down (*Id*. at 15). Warden Harrington then told Defendant Tourville to "get" him and the other inmate for "disrespecting him" (*Id*. at 15). Warden Harrington also told Defendants Hale, Lindenberg, and another officer to help Tourville (*Id*. at 16). Hale handcuffed Jellis while Tourville handcuffed the other inmate, and they were escorted to the segregation building (*Id*. at 16). In doing so, either Hale or Lindenberg had a hand on Jellis's neck holding his head down, and they "had [his] arms all jacked up" and "way up in the air" (*Id*. at 17, 23).

During the walk to the segregation building, Hale told Jellis "you disrespected the warden," and when Jellis responded, "how did I do that," he said "we're going to teach you not to disrespect him" (*Id*. at 23-24, 35). Hale then hit Jellis on the back of the neck with his fist (*Id*. at 23-24). Once they got into the building, the officers took Jellis to a

bullpen (a holding area), and Hale "grabbed [his] headlock and rammed [his] head into the [wire] cage" (*Id.* at 27). The two officers then began kicking and hitting Jellis for a couple of minutes (*Id.* at 27-28). They threw him down on his stomach, and Lindenberg placed his knee and all of his weight on Jellis's lower back (*Id.* at 29). Lindenberg removed one handcuff, but Hale told him not to remove the other. Hale then stomped on Jellis's lower back (*Id.* at 29-30). The other handcuff was removed, and both officers left the area (*Id.* at 30). Lindenberg came back a couple of times to verbally taunt Jellis (*Id.* at 37-38). During this entire incident, Jellis did not talk back or struggle (*Id.* at 34-35).

Jellis remained in the holding area for two hours until Tourville returned. At that point, Jellis asked for medical attention for the beating (*Id.* at 39-40). Tourville said nothing and presumably did not call for medical help (*Id.* at 40). By this time, a knot had developed on Jellis's neck and his knee was swelling up, such that he had difficulty putting on the brown segregation jumpsuit and had to limp to his new cell (*Id.* at 40, 45).

Later that evening, Jellis was served with a disciplinary ticket written by Defendant Davis for disobeying a direct order and for unauthorized movement (*Id.* at 43). The ticket states that Davis gave Jellis an order to lay on the ground and that Jellis refused "all direct orders to lay on the ground after 10-10's" (Doc. 141-2, p. 3). Jellis believes the ticket was false because he had not seen Davis on the yard and did not hear him give any orders (Doc. 141-1, pp. 47-48, 130). He surmises that Davis could not, therefore, have seen the incident (*Id.* at 47-48).[2]

---

[2] Davis attests that he was on the yard, that he did give an order to Jellis to get down, and that Jellis refused (Doc. 141-2, p. 1).

Jellis remained in his cell the next day and was taken to an Adjustment Committee hearing on the morning of August 29, 2013 (*Id*. at 53). The hearing officers were Veath and Hart (*Id*. at 55). When Jellis told Veath that he couldn't be on the committee because Jellis had just won a lawsuit against him, Veath said "I don't care" (*Id*. at 56). Jellis told the committee what happened to him, but Jellis was found guilty (*Id*. at 58, 67).[3] He was sentenced to three months of segregation, C-grade, commissary restrictions, and yard restrictions.

While in segregation, Jellis sought medical care from every medical technician that walked by (*Id*. at 65). Each one told him to put in a medical request slip (*Id*. at 66). Jellis was unable to do that, however, because he did not have a pen or paper (*Id*.). He finally was seen at his segregation cell by medical technician Aimee Lang on September 5, 2013 (*Id*. at 68, 71). After Jellis explained his injuries, Lang took his blood pressure and observed him walking by looking through the chuckhole of his cell (where food trays are placed) (*Id*. at 71). At this point in time, Jellis was limping on his left side and, while the swelling on his neck and knee had reduced, his neck was still tender and there was a 3-inch by 2-inch red mark on his knee (*Id*. at 71-74). He told Lang that he had sharp pains in his back and shooting pains down his leg. Lang gave Jellis twenty four Ibuprofen and twenty four Tylenol and instructed him on doing some exercises (*Id*. at 76). Jellis asked to see a doctor for his injuries; Lang refused (*Id*. at 77-78).

---

[3] In a declaration attached to his complaint, Jellis states that Veath "did not want to hear anything I had to say" (Doc. 1-3, p. 17).

Jellis filled out a nurse sick call request on September 9, 11, and 13 because he was still in pain; the medication took some of the pain away, but not all of it (*Id*. at 80-81, 83).[4] Jellis saw Lang again on September 16, 2013. At this appointment, Lang gave Jellis additional Tylenol and referred him to a doctor (*Id*. at 83-84). From September 5 to September 16, 2013, Jellis's conditions improved. His pain returned, however, after the pain medication ran out (*Id*. at 88).

The referral to a doctor did not result in Jellis actually being seen by Dr. Shearing. Dr. Shearing was the medical director from September 16, 2013, to November 13, 2013, when he ended his employment at Menard (Doc. 138-1, pp. 1-5). On September 20, 2013, a nurse noted that Jellis was not seen by Dr. Shearing because he was "out of time." On that date, fifteen inmates were on Dr. Shearing's call line (Doc. 138-4). Seven inmates with various conditions were "seen," one inmate was on a writ, one inmate was placed in error, three inmates were to be "recalled," and three additional inmates, including Jellis, were to be recalled because Dr. Shearing was "out of time" (*Id*.). In general, inmates are seen in the order they are placed on the list (Doc. 150-2, p. 9). One inmate with a boil was placed on the list after Jellis but was seen by Dr. Shearing that day. Jellis's appointment was rescheduled to September 27, 2013 (Doc. 138-2, p. 10; Doc. 138-4, p. 4).

On September 25, 2013, Jellis was transferred to Stateville Correctional Center (Doc. 138-2, p. 11), where he complained of neck, back and knee pain upon intake. He returned to Menard on October 9, 2013, and made no complaints upon intake (*Id*. at 12).

---

[4] Jellis indicated that the medication lasted three days because he took three tablets each, three times a day, as verbally instructed by Lang (Doc. 141-1, pp. 133-4).

Nonetheless, Jellis sent letters to Dr. Shearing on October 11, October 20, October 30, and November 12 about his severe pain (Doc. 1-3, pp. 40-44). He received no response (*Id*. at 19-20). Jellis was never seen by Dr. Shearing.

Jellis was released from segregation on November 27, 2013 (Doc. 141-1, 152). As of the date of his deposition, November 14, 2016, he had no more pain in his neck or knee, but he continued to have chronic low back pain (*Id*. at 149).

<h2 style="text-align:center">LEGAL STANDARD</h2>

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cnty.*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must

show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

DISCUSSION

## I.    Counts 1 and 2: Conspiracy to Attack Jellis

In Count 1, Jellis alleges that Warden Harrington ordered the attack on Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights. Similarly, in Count 2, Jellis alleges that Tourville carried out Harrington's orders to attack Jellis or conspired to facilitate the attack, in violation of Jellis's Eighth Amendment rights.

A conspiracy exists only if there is both "(1) an express or implied agreement among Defendants to deprive Plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Scherer v. Balkema,* 840 F.2d 437, 442 (7th Cir. 1988). "A party may not cry 'conspiracy' and throw himself on the jury's mercy"; he must present evidence that a conspiracy exists. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 436 (7th Cir. 1986). To establish the existence of a conspiracy, a plaintiff must demonstrate that the conspirators have an agreement to inflict injury or harm upon him. *Hernandez v. Joliet Police Dep't,* 197 F.3d 256, 263 (7th Cir.1999). "The agreement may be inferred from circumstantial evidence, but only if there is sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Id.* at 262. *Sow v. Fortville Police Dep't*, 636 F.3d 293,

304-05 (7th Cir. 2011).

Here, Defendants argue that Jellis has presented no evidence of a conspiracy. When Jellis was asked at his deposition why he believed there was a conspiracy, his response was "[b]ecause they're all together all the time." (Doc. 141-1, p. 126). Defendants argue that this conclusory statement fails to constitute sufficient evidence to survive summary judgment. In response, Jellis argues that Warden Harrington must have known Hale and Lindenberg were going to attack Jellis because Warden Harrington knows of their record of beating up inmates for "disrespecting the warden."

Jellis's argument is sheer speculation unsupported by the evidence in this case. At most, the evidence shows that Warden Harrington told Jellis to get down, that Jellis did not get down, and that Warden Harrington told correctional officers to get Jellis and take him to segregation for disrespecting him. There is no evidence that Warden Harrington told the officers to beat him up, nor can it be reasonably inferred from the evidence. Furthermore, there is no evidence that Warden Harrington conspired with anyone to attack Jellis. Jellis infers that, because the officers were always with Harrington and because they beat him up for disrespecting the Warden, the Warden was somehow involved. While conspiracies are often difficult to prove, evidence used to support the claim cannot be speculative. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015). Jellis has come forth with no evidence, either direct or circumstantial, that would support this claim.

For this same reason, Jellis's claim against Tourville also must fail. There is no evidence that Harrington ordered anyone to beat Jellis, there is no evidence that

Tourville beat Jellis, and there is no evidence that Tourville engaged in a conspiracy to beat him. Judgment as a matter of law must be granted in favor of Defendants Harrington and Tourville on Counts 1 and 2.

## II.      Count 3: Excessive Force

"The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the 'unnecessary and wanton infliction of pain' on prisoners." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). "In cases involving the claimed use of excessive force, 'the core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Outlaw*, 259 F.3d at 837 (quoting *Hudson*, 503 U.S. at 7). "In conducting this inquiry, a court must examine a variety of factors, including 'the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner.'" *Id.* With regard to the last factor, the Seventh Circuit recognizes that a plaintiff need not demonstrate a significant injury to state a claim for excessive force; however, "a claim ordinarily cannot be predicated on a *de minimis* use of physical force." *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000) (emphasis added) (citing *Hudson*, 503 U.S. at 5). Indeed, the use of *de minimis* force is necessarily precluded from the Eighth Amendment's prohibition on cruel and unusual punishment, provided that such force is not "repugnant to the conscience of mankind." *Outlaw*, 259 F.3d at 838 (quoting *Hudson*, 503 U.S. at 9-10).

Defendants argue that the amount of force used by Hale and Lindenberg was "reasonable" and that the "extent of injury to Mr. Jellis was minimal." Crediting Jellis's testimony, the evidence shows that Hale punched him in the neck while he was already being restrained by Lindenberg on the walk to segregation. When they got to the segregation building, they threw him against a wire cage and proceeded to hit and kick him. Then, Lindenberg placed his knee and weight on Jellis while removing handcuffs, and Hale stomped on his back. During the beating, Jellis was not being unruly or otherwise resisting. From this evidence, a jury could find that that the force applied was not in a good faith effort to maintain or restore discipline but rather to cause harm because of a perceived insult to Warden Harrington. *See Outlaw*, 259 F.3d at 837. Jellis's testimony establishes more than just a *de minimis* use of force and his injuries, while not life threatening, were more than just trivial. Defendants are not entitled to judgment on Count 3.

Insofar as Defendants include a general, "catch-all" argument concerning qualified immunity in their motion for summary judgment, the Court finds this argument unavailing as it is clearly established law that a prison official cannot, as Jellis alleges here, apply force maliciously and sadistically to cause harm. *See Thomas v. Stalter*, 20 F.3d 298, 302 (7th Cir.1994).

### III.   Counts 5 and 6: Due Process

In Count 5, Jellis alleges that Defendant Davis wrote him a false disciplinary ticket concerning Jellis's conduct in the prison cafeteria, in violation of Jellis's due process rights. In Count 6, Jellis claims Warden Harrington and Defendants Veath and Hart

imposed punishment on Jellis without providing him a fair hearing, in violation of Jellis's due process rights.

In *Hanrahan v. Lane*, 747 F.2d 1137, 1140–41 (7th Cir. 1984), the Seventh Circuit held that the filing of false disciplinary charges by a correctional officer does not state a Fourteenth Amendment claim when the accused inmate is given a subsequent hearing on those charges in which the inmate is afforded the procedural protections outlined in *Wolff v. McDonnell*, 418 U.S. 539 (1974). The Seventh Circuit reasoned that prisoners have a right "to be free from arbitrary actions of prison officials," *Hanrahan*, 747 F.2d at 1140, but determined that the procedural protections outlined in *Wolff* provided the appropriate protection against arbitrary actions taken by a correctional officer such as issuing the inmate a fabricated conduct violation. These procedural requirements include at least twenty four hours advance written notice of the charges prior to a hearing, the opportunity to call witnesses and present certain evidence, and the right to a written statement providing the basis of decision and the evidence relied upon. *Wolff v. McDonnell*, 418 U.S. 539 (1974). Procedural safeguards also require adjudication by a "neutral committee." *McKinney v. Meese*, 831 F.2d 728, 733 (7th Cir. 1987).

In this case, the evidence reveals that Jellis was given adequate advance notice of the charges, there is no indication he was not allowed to call witnesses or present evidence,[5] and he received a written statement of the basis of the decision and the evidence relied upon. Thus, Jellis's claim that Davis wrote a false disciplinary charge does not rise to the level of a Fourteenth Amendment violation.

---

[5] Jellis claims he sought a lie detector test, but the Court is unaware of any rule of law that would mandate the granting of such a request.

Furthermore, while Jellis claims Veath and Hart were not impartial members of the Adjustment Committee, he has presented no evidence demonstrating Hart was partial, and his only evidence that Veath was not neutral is that Jellis previously won a lawsuit against him. Jellis says he pointed this out to Veath, and Veath said he didn't care.

"Adjudicators are entitled to a presumption of honesty and integrity, and thus the constitutional standard for impermissible bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) (citations omitted). In *Redding v. Fairman*, 717 F.2d 1105 (7th Cir. 1983), the Seventh Circuit reversed a finding that committee members, who are defendants in pending litigation instituted by a person appearing before them, are not neutral and must recuse. *Id*. at 1113. The court noted that:

> From a practical standpoint, requiring each staff member who is the subject of a separate lawsuit [from an inmate] to disqualify himself from sitting in judgment of that inmate would heavily tax the working capacity of the prison staff. . . . If every named defendant in a prisoners' rights lawsuit must be disqualified from sitting on the Adjustment Committee, such a litigation strategy would vest too much control in a prisoner to determine the Committee make-up.

*Id.* The Seventh Circuit concluded that disqualification must be decided on a case-by-case basis after the district court determines the extent of the committee member's personal involvement in the lawsuit. *Id.*

Jelllis has made no showing that either Veath or Hart were involved in the underlying events of August 27, 2013. *See Merritt v. De Los Santos*, 721 F.2d 598, 600-601 (7th Cir. 1983) (noting that other Circuit Courts have held that "the requirement of impartiality mandates the disqualification of an official who is directly involved in the

incident or is otherwise substantially involved in the incident but does not require the disqualification of someone tangentially involved."). Besides stating that Veath was an unsuccessful defendant in a previous suit, Jellis provides no other evidence of bias. There is no showing of any relationship between Veath and Davis such that Veath should not have believed the disciplinary report (which was used to justify the discipline). Without any context or additional circumstances, there is no showing of bias. Defendants are entitled to judgment on Counts 5 and 6.

**IV.    Count 8: Deliberate Indifference as to Defendant Lang**

In Count 8, Jellis alleges that Defendant Lang delayed treatment for the injuries Jellis incurred during the attack, in violation of Jellis's Eighth Amendment rights. The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Jellis must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances could constitute a serious medical need: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-513 (7th

Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

Second, a prisoner must show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted).

Defendant Lang does not argue that Jellis did not suffer from a serious medical condition. Thus, the Court need only determine whether Lang acted with the requisite state of mind. In this case, there is no evidence that Lang was aware of Jellis's medical

condition until she saw him on September 5, 2013, eight days after the beating. At that time, she took his history and complaints (which included sharp, radiating pain), she measured his blood pressure, she viewed his injuries (which had diminished), and she observed him walking—all through a narrow chuckhole. She then gave him two types of pain medication, directed him to consume the pills such that the prescription only lasted three days, and told him to do some exercises. She refused to refer him to a doctor.

Defendants do not explain how a medical technician is qualified or capable of evaluating any medical condition, let alone Jellis's complaints of sharp and radiating pain. It is unclear to the Court, because Defendant does not explain, what tests she employed to evaluate his complaints, how any of the tests she performed informed her about Jellis's condition, or how she was capable of diagnosing his condition such that she was able to give him medication. It would have been easy enough to refer Jellis to a doctor, or even to a nurse, who would appear to have the medical training to evaluate his condition. Therefore, a jury may find her perfunctory treatment of Jellis and her refusal to refer him to a doctor exhibited deliberate indifference. *Greeno*, 414 F.3d at 653 (quotation marks omitted) (stating that deliberate indifference can be shown where responses to complaints were "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition.").

Moreover, a jury may find that her delay in referring Jellis to a doctor exhibited deliberate indifference. Delay in access to medical care can show deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). "The length of delay that is tolerable depends on the seriousness of

the condition and the ease of providing treatment." *Mcgowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). As noted above, it would have been a simple task to refer Jellis to a doctor. And, because of her instructions regarding pain medication, Jellis ran out of all medication within days of her treatment, leaving him in pain and without any option to seek additional care. *See Arnett*, 658 F.3d at 753 (finding that delay in access to medical care can show deliberate indifference). Defendant is not entitled to judgment on Count 8.

## V.     Count 9: Deliberate Indifference as to Dr. Shearing

Finally, in Count 9, Jellis claims Dr. Shearing failed to treat him for the injuries he incurred during the attack, in violation of his Eighth Amendment rights. As indicated above, Jellis was never seen by Dr. Shearing. After he was referred to a doctor on September 16, 2013, he was scheduled for an appointment on September 20, 2013. The evidence reveals that Dr. Shearing ran out of time that day. When Jellis was rescheduled on September 27, he had already been transferred to Stateville. Jellis believes that because Dr. Shearing saw an inmate on September 20 who was further down on the list, Dr. Shearing must have intentionally refused to see him.

Dr. Shearing has no independent recollection of September 20, 2013, or of Jellis in particular (Doc. 138-1, p. 2). He also does not recall receiving any letters from Jellis (*Id.* at 4) and states that he had "no involvement in routine scheduling of inmates for sick call visits" (*Id.* at 2). Based on this evidence, Dr. Shearing knew, at most, that Jellis wanted to see a doctor for back, neck, and knee pain and had been referred by a nurse. The fact that he did not actually see Jellis on September 20 appears to be, at most, a negligent oversight: he simply ran out of time that day. Jellis was rescheduled for an appointment

one week later, but was then transferred to another prison before he could be seen. Furthermore, the fact that Dr. Shearing had a general practice of seeing patients in the order listed does not demonstrate that, by treating an inmate listed after Jellis, he intended to inflict harm or cause unnecessary pain. There simply is no evidence that Dr. Shearing had any intent to deny or delay medical care such that a jury could find that he was deliberately indifferent. Jellis's attempt to refute the evidence, as opposed to coming forth with affirmative evidence, cannot defeat summary judgment. *See Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997) ("Upon the filing of a motion for summary judgment, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial."). As such, there is no evidence that Dr. Shearing was deliberately indifferent to Jellis's medical needs prior to his transfer to Stateville.

With regard to the period of time after Jellis returned to Menard, however, the record contains four letters that Jellis penned, directed to Dr. Shearing and dated between October 11 and November 12, 2013. These letters state that Jellis was referred to a doctor but never was seen for his severe pain. Dr. Shearing does not remember receiving these letters, and they are not contained in his medical files (Doc. 138-1, p. 4). Jellis testified that he placed these letters in an envelope, addressed them to Dr. Shearing, and that they were picked up by a gallery officer for delivery (Doc. 141-1, p. 113-4).

Notwithstanding Jellis's lack of argument, a prison official "cannot simply ignore an inmate's plight." *Arnett*, 658 F.3d at 755; *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016). If a letter, "in its content

and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety,'" he can be found to be deliberately indifferent to his serious needs. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. 837); *see also Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2017), overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n. 1. The letters here state that Jellis is in severe pain, that he cannot sleep, and that he was beaten. They were placed in Jellis's cell bars and were picked up by a gallery officer for delivery. Dr. Shearing only stated that he did not *recall* receiving the letters; he left open the possibility that he did actually receive them. *See Jones v. Drew*, 221 F. App'x 450, 454 (7th Cir. 2007); *Taylor v. Garcia*, 2015 WL 5895388, * 4-5 (N.D. Ill. 2015); *Myles v. Chandler*, 2017 WL 4005924, * 6-7 (N.D. Ill. 2017) (distinguishing *Johnson* on the evidence that the defendant did not always read his mail versus the evidence in *Johnson* that the director "never" read his mail).

Based on this evidence, limited as it may be, Dr. Shearing is not entitled to judgment on Count 9 for the time period of October 11, 2013, to November 13, 2013. The Court further rejects Dr. Shearing's qualified immunity argument, as there literally is no argument but rather only a recitation of the law on qualified immunity. Thus, Dr. Shearing has not demonstrated how he is entitled to qualified immunity.

### Conclusion

For the reasons stated above, Dr. Shearing's motion for summary judgment (Doc. 137) is **GRANTED in part and DENIED in part**, the IDOC Defendants' motion for summary judgment (Doc. 140) is **GRANTED in part and DENIED in part**, Jellis's supplemental motion (Doc. 154) is **STRICKEN**, Dr. Shearing's motion to strike

(Doc. 155) is **GRANTED,** and the IDOC Defendants' motion to strike (Doc. 157) is **DENIED**. Jellis's motion for clarification (Doc. 158) is **DENIED as moot**.

Judgment is granted in favor of Harrington and against Jellis on Count 1. Judgment is granted in favor of Tourville and against Jellis on Count 2. Judgment is granted in favor of Davis and against Jellis on Count 5. Judgment is granted in favor of Harrington, Veath, and Hart and against Jellis on Count 6. The Clerk of Court shall enter judgment accordingly at the conclusion of this matter. The only counts remaining are:

**Count 3:**    Hale and Lindenberg used excessive force against Jellis, in violation of Jellis's Eighth Amendment rights;

**Count 8:**    Lang delayed giving Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights; and,

**Count 9:**    Dr. Shearing failed to give Jellis treatment for the injuries he incurred during the attack, in violation of Jellis's Eighth Amendment rights.

As set forth above, Count 9 is limited to the time period of October 11, 2013, to November 13, 2013.

This matter shall be set for trial by separate notice. Magistrate Judge Wilkerson is **DIRECTED** to recruit counsel for Jellis for trial purposes only.

**IT IS SO ORDERED.**

DATED:   **September 26, 2017**

**NANCY J. ROSENSTENGEL**
**United States District Judge**